IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FELIPE FRANCHINI,                        )
                                         )
                    Plaintiff,           )
                                         )
         v.                              )   No. 12 C 279
                                         )
UCHICAGO ARGONNE, LLC, d/b/a             )
"Argonne National Laboratory,"          )
                                         )
                    Defendant.           )

# <u>OPINION AND ORDER</u>

Plaintiff Felipe Franchini is a naturalized United States citizen who was

born in Mexico.  From February 2000 until discharged in October 2008, plaintiff

was employed by defendant UChicago Argonne, LLC, which does business as

Argonne National Laboratory.  Argonne National Laboratory is a scientific

research facility owned by the United States Department of Energy ("DOE") and

operated by defendant pursuant to a contract with DOE.  Plaintiff was not an

employee of the federal government.  Plaintiff alleges that he was subjected to

national origin harassment resulting in a hostile environment in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*,

and 42 U.S.C. § 1981. Discrimination based on a Mexican birthplace constitutes race discrimination prohibited by § 1981. ***Cardenas v. Aramark Facility Servs., Inc.***, 2006 WL 1344057 *2 (N.D. Ill. May 11, 2006). Plaintiff also contends that he was discharged based on national origin discrimination, also in violation of Title VII and § 1981, or possibly based on retaliation for complaining about harassment. Defendant has moved for summary judgment dismissing all claims.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. ***Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.***, 555 U.S. 271, 274 n.1 (2009); ***Malen v. MTD Prods., Inc.***, 628 F.3d 296, 303 (7th Cir. 2010); ***Stokes v. Bd. of Educ. of City of Chicago***, 599 F.3d 617, 619 (7th Cir. 2010). The burden of establishing a lack of any genuine issue of material fact rests on the movant. ***Ponsetti v. GE Pension Plan***, 614 F.3d 684, 691 (7th Cir. 2010); ***Outlaw v. Newkirk***, 259 F.3d 833, 837 (7th Cir. 2001). The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986); ***Montgomery v. Am. Airlines, Inc.***, 626 F.3d 382, 389 (7th Cir. 2010). The movant need not provide affidavits

or deposition testimony showing the nonexistence of such essential elements.

*Celotex*, 477 U.S. at 324; *Freundt v. Allied Tube & Conduit Corp.*, 2007 WL

4219417 *2 (N.D. Ill. Nov. 29, 2007); *O'Brien v. Encotech Constr.*, 2004 WL

609798 *1 (N.D. Ill. March 23, 2004). Also, it is not sufficient to show evidence

of purportedly disputed facts if those facts are not plausible in light of the entire

record. *See Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594-95

(7th Cir. 2007); *Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of*

*Chicago*, 357 F.3d 677, 679 (7th Cir. 2004); *Lampley v. Mitcheff*, 2010 WL

4362826 *6 (N.D. Ind. Oct. 27, 2010). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the
> initial burden of production to identify "those portions of the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, which
> it believes demonstrate the absence of a genuine issue of
> material fact." *Logan v. Commercial Union Ins. Co.*, 96 F.3d
> 971, 978 (7th Cir. 1996) (citing *Celotex Corp. v. Catrett*,
> 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (citation and
> internal quotation omitted)). The moving party may discharge
> this burden by "'showing'--that is, pointing out to the district
> court--that there is an absence of evidence to support the
> nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S. Ct.
> 2548. Once the moving party satisfies this burden, the
> nonmovant must "set forth specific facts showing that there is
> a genuine issue for trial." Fed. R. Civ. P. 56(e). "The
> nonmovant must do more, however, than demonstrate some
> factual disagreement between the parties; the issue must be
> 'material.'" *Logan*, 96 F.3d at 978. "Irrelevant or unnecessary

facts do not preclude summary judgment even when they are in dispute." *Id.* (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" *Logan*, 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).

*Outlaw*, 259 F.3d at 837.

Local Rule 56.1 sets forth certain procedures for summary judgment motions. The movant is to file a properly supported statement of facts consisting of numbered paragraphs. L.R. 56.1(a)(3). The nonmovant is to provide a paragraph-by-paragraph response to the movant's statement. L.R. 56.1(b)(3)(B). Further, the nonmovant may provide a statement of additional facts. L.R. 56.1(b)(3)(C). It is within the court's discretion as to how strictly to apply

Local Rule 56.1.  As long as the facts are presented in a manageable form, this bench generally will exercise its discretion to not strictly enforce the requirements of Local Rule 56.1.  *See Banaei v. City of Evanston*, 2012 WL 4892414 *2 (N.D. Ill. Oct. 11, 2012); *see also Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 409 (7th Cir. 2009); *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 527 (7th Cir. 2000).  Defendant contends that plaintiff violates Local Rule 56.1(b)(3) by including additional facts in his response to defendant's fact statement instead of setting them out in a separate statement of additional facts.

> [T]he phrase "additional facts" [as used in Local Rule 56.1(b)(3)(C)] does not mean all facts other than the facts asserted by the movant's Local Rule 56.1(a)(3) statement, but rather only those additional facts that are not intended to show that the movant's asserted facts are disputed.  Local Rule 56.1(b)(3)(B) provides that the non-moving party should offer factual responses, along with record citations supporting those responses, that controvert the movant's statements of fact, and that the non-movant must limit those factual responses to facts that are indeed responsive to the movant's assertion--that is, to facts that fairly contradict what the movant has actually asserted.  If the non-movant wants to assert facts that go beyond what is fairly responsive to the movant's factual assertion, then he must do so not in his Local Rule 56.1(b)(3)(B) response, but in his "statement . . . of any additional facts that require denial of summary judgment" under Local Rule 56.1(b)(3)(C).  *See Johnson v. Cnty. of Cook*, 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to

which the non-movant is responding, in a Local Rule
56.1(b)(3)(B) response.  Rather, Local Rule 56.1 requires
specifically that a litigant seeking to oppose a motion for
summary judgment file a response that contains a separate
statement under Local Rule 56.1(b)(3)(C) of any additional
facts that require the denial of summary judgment.") (first
emphasis added, citations and internal quotation marks
omitted).  The line between a responsive fact that should be
included in a Local Rule 56.1(b)(3)(B) response and an
extraneous fact that must be stated in a Local Rule
56.1(b)(3)(C) statement is not always bright, . . . .

*Levin v. Grecian*, 2013 WL 2403642 *1 (N.D. Ill. May 31, 2013).  *See also*

*Spitz v. Proven Winners N. Am., LLC*, 2013 WL 4501444 *2 (N.D. Ill.

Aug. 22, 2013).

Here, plaintiff strays on occasion, but plaintiff's response is not an

egregious violation of limits on additional facts.  While not required to do so,

nothing in Local Rule 56.1 precluded filing a response to plaintiff's Local Rule

56.1(b)(3)(B) statement so defendant could have responded if it had wanted to do

so.  *See Spitz*, 2013 WL 4501444 at *2.  To the extent plaintiff strays beyond the

limits, the extraneous facts generally are not material.  All of plaintiff's responses

will be considered.  To the extent any factual assertions are not supported by

citations to an admissible form of evidence, they will not be credited.

Defendant objects that certain statements in plaintiff's declaration are improper hearsay. To the extent plaintiff is trying to prove, through statements to him that the speaker actually did something or a person other than the speaker said something, that is generally an improper use of such evidence. To the extent plaintiff is showing that the person speaking to him was making harassing statements to plaintiff, that is not inadmissible hearsay.

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of summary judgment are as follows. Plaintiff was employed by defendant from February 2000 until October 10, 2008. His last position was as a Senior Technician assigned to Building 366. He assisted scientists with their experiments on the Argonne Wakefield Accelerator, constructed and installed certain Accelerator parts, conducted general building maintenance, painted modules, cleaned module parts, cleaned parts of the Accelerator, purchased materials and supplies, and cleaned areas of the laboratory. From 2000 through October 10, 2007, Victor Guarino was plaintiff's direct supervisor. Guarino reported to Division Directors Larry Price and Harry Weerts. During the remainder of his employment, plaintiff was supervised by Facilities Manager Manoel Conde.

Conde reported to Wei Gai. None of the harassers in this case had the authority to hire, fire, demote, promote, transfer, or discipline plaintiff.

The incidents of harassing behavior for which plaintiff has evidence occurred over approximately seven years, from sometime in 2001 until early 2008. Every one of these incidents is described below.

In Fall 2003, "Tomorrow, row, row, row your boat. Go, go, return, vato" appeared on the men's room wall in Building 366. The parties agree "vato" is Spanish for "dude." Plaintiff promptly complained about it to Price, who, at one point, commented: "Oh, I've never heard about that one. I heard about wetbacks." The graffiti was not removed until seven months later, after further complaints by plaintiff. In late 2006 or early 2007, a modified *Wizard of Id* cartoon was placed in plaintiff's mailbox. It made reference to a stablehand shoveling manure as being a "tech" and falling for insincere awards and titles. In August 2007, a leaflet was placed in plaintiff's mailbox with a photo from a safety seminar showing maintenance workers' improper use of placing a bucket on the top step of a ladder in order to be able to reach into a ceiling. The worker whose face can be seen appears Hispanic. "Mexicoon" is written on the photo with a pointing arrow. "Bucketman Returns. . . Again!" was typed above the photo and text was typed

below sarcastically describing improper ladder usage and "Mex" was handwritten in. "Comprendo" is written at the bottom.

On occasions in 2001 and 2003, plaintiff complained to Guarino about Tim Nephew's conduct. In 2002 or 2003, he complained to Price. In late 2006, he complained to Sue Morss, an alternate shift manager. Nephew would repeat words plaintiff said to mock his accent. On one occasion, Nephew told plaintiff, "Well, if Kenny tells me to move it. I don't care if you stick it up your ass." When plaintiff complained about being talked to that way, Nephew sarcastically responded, "That's English. You know English."

Sometime between 2001 and 2003, Ivars Ambats told plaintiff: "Well you need to keep eating more beans. That will make you better" and used the term "compadre." Plaintiff complained to Guarino and there were no further comments from Ambats.

In 2004, Robert Stanek said to plaintiff, "It's one of these fucking things about these fucking Mexicans, that they need to be represented, so Felipe has to be in the picture." Plaintiff complained to Price and Stanek made no further comments.

In 2003 or 2004, Wood asked plaintiff, "Do Mexicans normally tip themselves?  I went and got some tacos, and I didn't get any change back when I got the tacos."  Plaintiff complained to Morss about this statement.  This was part of a general complaint about treatment and plaintiff does not say when he made the complaint.  Plaintiff now contends he also complained to Price, but his present declaration is inconsistent with his prior deposition testimony, compare Pl. Decl. [50][1] ¶ 8 with Pl. Dep. [45-2] 131, and there is no explanation for the change in testimony.  *See Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 406-07 (7th Cir. 2008).

Frank Skrzecz and Zeljko Matifas would whistle when plaintiff walked into a room.  Conde told Skrzecz to stop as did Weerts.  Skrzecz would also bang on machines when plaintiff came into the shop.  This stopped for awhile and began again in 2007.

On June 21, 2007, plaintiff had a two-hour long argument with Frank Skrzecz.  At one point during the argument, Skrzecz stated that "because [plaintiff] was Mexican and [plaintiff's] wife worked [at defendant], that was the

---

[1]The bracketed number refers to Docket Entry number.

only reason [he] got the job at" defendant. An investigation of the argument was conducted and both participants were disciplined.

In late 2007 plaintiff was trying to make room for himself in the shop and Skrzecz said to plaintiff, "You fucking Mexicans are like octopus. You spread everywhere." Plaintiff complained to Conde about Skrzecz, but not about this specific statement. In his declaration, plaintiff states he complained about this statement, but that is contradicted by plaintiff's prior deposition testimony. Compare Pl. Decl. [50] ¶ 8 with Pl. Dep. [45-2] 135.

On September 21, 2007, Howe and Diversity Program Office Manager Eve Gohoure sent plaintiff the following memo, which he received.

> SUBJECT:   **Employee Concerns**
>
> In order for the Laboratory to investigate and respond to your concerns, this memo is to request your assistance in identifying specifically the issues you want to bring to the Laboratory's attention. Please provide in writing a list of the Diversity and Employee Relations issues you want to identify and submit a copy to Ms. Gohoure and me by the close of business on September 26, 2007. We would request that you provide as much detail information as reasonably possible in order for us to properly investigate.

Exh. 27 to Pl. Dep. [45-2 at 145]. Plaintiff did not respond to this request nor October 3 and October 10 follow-ups. Plaintiff states in his declaration that he did

not respond because he initially told Howe he had notes of incidents at home and Howe then accused plaintiff of engaging in the criminal conduct of stealing federal property by taking home the paper on which the notes were taken. Plaintiff states that, thereafter, he was fearful of disclosing his notes.

Although no investigation was completed due to plaintiff's non-response, Weerts held a meeting with all the members of plaintiff's department at which he spoke of the need to treat everyone with respect and dignity and have a collegial atmosphere. He also spoke of the need to report incidents, including any incident in which a co-worker "feel[s] threatened, treated wrongly or whatever." Weerts also announced at the meeting that plaintiff was being transferred to the group supervised by Conde.

In early February 2008, Daniel Van Lannen was doing welding work for Wood while Wood and Nephew waited for the work. Wood complained to Nephew about Conde providing space in his office for plaintiff. Wood said that a "Brazilian wetback" was helping a "fucking spic wetback [and] the White boys don't get anything [because the] Blacks and Mexicans get everything." He also said, "all fucking wetbacks should go back to their country." When Van Lannen complained about what the other two were saying, Wood called Van Lannen a

"fucking wetback lover." Later in February, Van Lannen told plaintiff what he heard Wood saying. At the time of the incident, Van Lannen recognized Wood but did not know his name. He later determined Wood's name.

That Wood made the statements is not based on plaintiff's hearsay testimony that Van Lannen told plaintiff Wood said it. Plaintiff provides Van Lannen's declaration to show Wood made the statements.

Darryl Howe, Employee Relations Manager, investigated this incident. He interviewed Wood, Van Lannen, and plaintiff and examined related records. Howe determined that it could not be concluded that Wood was the one who made the statements.

At a June 6, 2008 meeting with Howe, Weerts, and a union representative, plaintiff was receiving corrective action for insubordination that he had been found to have committed. In response to questions starting with whether he was recording that meeting, plaintiff stated that he had recorded approximately 50 conversations he had with Argonne employees, generally without the other participants' knowledge. As early as 2004, plaintiff had informed various defendant personnel that he had recorded conversations. At various times, he informed Howe, Gouhore, and Price, as well as others. Previously, no one told

him the recordings were illegal or violated defendant's policies. Plaintiff was recording the June 6 meeting. Plaintiff was asked to provide copies of all taped conversations. Plaintiff states he sent eight tapes to Howe via interoffice mail and included a note that he needed more time to gather additional tapes. Howe states that he did not receive the package.

On June 9, 2008, plaintiff began a medical leave of absence. During this medical leave, defendant sent plaintiff four letters. Plaintiff admits he received the first three, but contends there is a factual dispute as to whether he received the October 3, 2008 letter. The first letter, dated June 13, 2008, summarized the June 6 meeting and stated defendant "considers that delay in producing [the recorded conversations is] insubordination." The letter states that plaintiff is "again directed" to produce all the tape recordings and to bring them to Howe "when you return to work."[2] Plaintiff is warned that failure to comply could lead to further corrective action up to and including a discharge. Pl. Exh. 7 [50-1]. The October 3 letter from Weerts again instructs plaintiff to return the illicitly-made recordings and provides plaintiff with a prepaid Federal Express box for delivery. It is further stated that failure to return the recordings by October 8,

[2]Plaintiff was on medical leave when he received the June 13 letter and did not return to work from medical leave prior to being discharged in October.

2008 would result in the termination of plaintiff's employment. Plaintiff did not respond. The FedEx tracking receipt states that the "package" was left on plaintiff's porch on October 6. Plaintiff testified that he never received the package and that he did not see the enclosed letter until he saw it at a grievance hearing in December. For present purposes, it is assumed plaintiff did not receive the October letter. It is also taken as true that Howe and Weerts believed plaintiff had received it. Testimony by Weerts that certified mail is sometimes used to ensure a person receives a letter, Weerts Dep. [45-4] at 25-26, does not raise a genuine factual dispute that Howe and Weerts did not sincerely believe the letter had been delivered to plaintiff. Regardless of whether plaintiff received this final letter, he had not previously sent any tapes other than the eight that were never received by Howe.

Plaintiff's failure to provide recordings was viewed as insubordination. Weerts, in consultation with Howe, terminated plaintiff's employment effective October 10, 2008. A letter to that effect was sent on the same day by FedEx. Plaintiff received this letter, which was also left on his porch.

Defendant was aware Conde had recorded conversations of other employees. Conde returned the tapes, was reprimanded, and lost vacation days.

Plaintiff contends that Leon Reed also recorded conversations and that, on June 6, plaintiff so informed those present. However, the only evidence that Reed recorded conversations is plaintiff's testimony that Reed recorded a conversation with plaintiff. It is unclear if this is based solely on Reed's statement to plaintiff or if Reed actually showed plaintiff the recorder or played the recording. *See* Pl. Dep. [45-2] at 157-58; Pl. Decl. [50] ¶ 33. Reed denies making such a recording. Reed Decl. [45-7]. Plaintiff points to no evidence that he told Howe or other supervisors that Reed made such recordings. *See* Pl. 56.1 Resp. [54] (citing Pl. Decl. [50] ¶ 33). Also, since Reed disclosed to plaintiff that he was recording the conversation with plaintiff, the recording would not violate Illinois law against recording a conversation with another person without so indicating.

On June 6, 2008 plaintiff filed a charge of discrimination with the EEOC, checking the retaliation and national origin boxes. On November 25, 2008, plaintiff filed an amended charge adding that he was discharged on October 10 in retaliation for pursuing the initial charge.

To prevail on his hostile work environment claim, plaintiff must demonstrate that (1) his work environment was both objectively and subjectively offensive; (2) the harassing conduct was based on his Mexican nationality; (3) the

conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). Defendant contends the third and fourth elements are not satisfied. As to the third element, "we consider the totality of the circumstances, *Venters [v. City of Delphi]*, 123 F.3d [956,] 975 [(7th Cir. 1997)], including 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.'" *Porter*, 700 F.3d at 955-56 (quoting *Scruggs*, 587 F.3d at 840). Since none of the harassers had supervisory authority over plaintiff, *see generally Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013), satisfying the fourth element requires a showing that defendant was negligent in discovering or remedying the harassment. *Lambert v. Peri Formworks Sys., Inc.*, ___ F.3d ___, 2013 WL 3814331 *2 (7th Cir. July 24, 2013).

Spread out over seven years, this is not a pervasive amount of incidents. Plaintiff relies on *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950-51 (7th Cir. 2005) ("*Cerros II*"), which stated:

> We emphasized in *Cerros I*, [288 F.3d 1040 (7th Cir. 2002)] that "[w]hile there is no 'magic number' of slurs that

indicate a hostile work environment, we have recognized
before that an unambiguously racial epithet falls on the 'more
severe' end of the spectrum."  288 F.3d at 1047 (citing
*Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675
(7th Cir. 1993)).  Indeed, we find it difficult to imagine
epithets more offensive to someone of Hispanic descent than
those directed at Cerros.  *See, e.g.*, *Torres v. Pisano*, 116 F.3d
625, 632-33 (2d Cir. 1997) ("[A] reasonable Puerto Rican
would find a workplace in which her boss repeatedly called
her a 'dumb spic' and told her that she should stay home, go
on welfare, and collect food stamps like the rest of the 'spics'
to be hostile.").  While we acknowledge that the "mere
utterance of an [ ] epithet which engenders offensive feelings
in an employee does not sufficiently affect the conditions of
employment to implicate Title VII," *Harris v. Forklift Sys.,
Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation
marks omitted), we also recognize that pervasiveness and
severity "are, to a certain degree, inversely related; a
sufficiently severe episode may occur as rarely as once, while
a relentless pattern of lesser harassment that extends over a
long period of time also violates the statute."  *Cerros I*,
288 F.3d at 1047 (internal citation omitted).  If, as suggested
in the district court's September 2003 order, Cerros was
subjected to graffiti calling him a "spic" and "wetback,"
directing him to "go back to Mexico," and proclaiming
"KKK" and "white power," the fact that each individual
epithet may have appeared in isolation does not undo their
cumulative effect.  *See McGinest v. GTE Serv. Corp.*,
360 F.3d 1103, 1116 (9th Cir. 2004).

But even *Cerros II* acknowledges that a single incident of an utterance

ordinarily will not be enough and a fewer number of incidents requires a greater

level of severity than a larger number.  As was recently noted in a district court

case: "The EEOC seems to suggest, through its citation to [*Cerros II*] that RJB's conduct was 'severe' because Shumpert called Navarro a 'wetback,' in her presence and referred to her by other derogatory terms to others. *See id.* at 950-51 ('an unambiguously racial epithet falls on the more severe end of the spectrum'). But the *Cerros* court also acknowledged that the 'mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII,' and indeed, the Seventh Circuit has elsewhere recognized that 'an objectively hostile work environment is not produced "where most of the offensive comments giving rise to the claim were not directed at the plaintiff, and those that were directed at plaintiff were isolated."' *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005) (citations omitted)." *EEOC v. RJB Props., Inc.*, 857 F. Supp. 2d 727 (N.D. Ill. 2012).

Also, in an unpublished decision, the Seventh Circuit distinguished *Cerros II* and stated:

> A hostile work environment requires that the plaintiff show, among other things, that the conduct was "severe or pervasive" enough to create a hostile work environment. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). The most egregious incidents alleged in this case are that a co-worker flashed a Ku Klux Klan sign toward Pierce

and that a different co-worker called him a "nigger." Both incidents took place in 1999, four years before Pierce left IDHS, and the latter occurred in a park while the co-worker was not working. These actions were deplorable. Nonetheless, isolated incidents like these involving other co-workers do not rise to the level of environments we have deemed hostile. *See, e.g.* **Peters v. Renaissance Hotel Operating Co.**, 307 F.3d 535, 552 (7th Cir. 2002) (isolated statements by co-worker, including one use of word "nigger," did not rise to the level of objectively hostile environment). Pierce does point to other comments referencing race: (1) in 1994, one of his co-workers commented that all blacks look alike; (2) in 1994, Pierce heard two racist jokes in the smoke room; (3) in 1994, a co-worker commented that he was glad that the school was hiring more blacks; (4) at a cultural diversity workshop on October 6, 1995, the word "nigger" was used as part of the presentation; and (5) in March or April of 1996, a co-worker told Pierce that her husband worked at Western Illinois Correctional Center and she feared for his safety because he had to work with African-American inmates in the barber shop. Many of these comments, however, were not directed at Pierce. *See* **Peters**, 307 F.3d at 552 (impact of "second-hand" harassment not as great as harassment directed at the plaintiff). None involved a supervisor. *Cf.* **Cerros v. Steel Technologies, Inc.**, 398 F.3d 944 (7th Cir. 2005) (reversing grant of summary judgment for defendant where supervisors and co-workers subjected plaintiff to direct and highly racial epithets, co-workers openly advocated the Ku Klux Klan, and there was racially-motivated graffiti in bathroom). All told, the incidents that took place over a ten-year period do not rise to the level of an objectively hostile work environment. *See* **Peters**, 307 F.3d at 552.

**Pierce v. Ill. Dep't of Human Servs.**, 355 F. App'x 28, 31-32 (7th Cir. 2009).

The evidence plaintiff has presented does not reach the level of severe or pervasive. There is no evidence of physical threats or intimidation. Plaintiff was never directly called a wetback or spic. The only reported use of those terms was the second-hand report from Van Lannen. There was one written reference to going back to Mexico and one other that was part of Van Lannen's second-hand report. The cartoon and leaflet implied Mexicans were ignorant, uneducated, and/or unsophisticated and the leaflet used the term Mexicoon. Other comments were about Mexicans and other minorities receiving favorable treatment and not understanding English or mocking plaintiff's accent. There was also one comment about eating beans and one about dishonesty (keeping the change). Other incidents (the noisemaking) were attempts to annoy plaintiff without mentioning his nationality. Furthermore, there is no evidence that the harassment interfered with plaintiff's work performance.[3] Plaintiff does not satisfy the severe or pervasive harassment element. *Cf.* **Peters**, *supra*; **Pierce**, *supra*; **RJB Props.**, *supra*.

---

[3]In ¶ 59 of his Fact Statement [54], plaintiff asserts: "[S]ince August 2007, plaintiff had been using up sick days because of work related stress, anxiety and depression, for which he was receiving medical treatment." He doe not assert that this was related to the harassment. Also, the materials cited for support do not establish that he was suffering from stress, anxiety, or depression. They only support that he was on medical leave. *See* Pl. Decl. [50] ¶ 37; Pl. Exh. 12 [50-1].

Even if there were sufficient facts to satisfy the severe or pervasive element, plaintiff's hostile environment claim fails because there is insufficient evidence that defendant is responsible for the conduct of plaintiff's co-workers. When plaintiff reported harassing incidents, his supervisors generally responded by actually stopping or attempting to stop the conduct of the co-workers. There was a delay in removing the washroom graffiti, but it was eventually removed. The comments of Ambats and Stanek were limited to one each, with both stopping immediately after plaintiff complained to a supervisor and the supervisor spoke to the offending co-worker. Skrzecz's noisemaking temporarily stopped when he was spoken to by a supervisor. Nephew's conduct was spread out over a longer period, but he stopped making comments directly to plaintiff. When defendant attempted a fuller investigation in 2007, plaintiff did not cooperate. Nevertheless, Weerts spoke to members of the department and also transferred plaintiff to a different supervisor to avoid interactions with the offending co-workers. While plaintiff worked for less than a year after that meeting and was on medical leave during part of it, there is no evidence of a further incident after that point except the comments that were made outside plaintiff's presence, but reported to him by

Van Lannen.  Plaintiff does not present any sufficient basis for holding defendant liable for the conduct of his co-workers.

Since neither the third or fourth element of the hostile environment claim is satisfied, that claim will be dismissed.  Since the hostile environment claim otherwise fails, it is unnecessary to address defendant's statute of limitations contentions.

The other aspect of plaintiff's cause of action is unclear.  In the body of his Complaint, plaintiff refers to "discriminatory behavior in employment termination," Compl. [1] ¶ 44, and refers to "intentional discriminatory behavior, " *id.* ¶ 48, with no express reference to retaliation.  Attached to the Complaint is the EEOC charge referring to both retaliation and national origin discrimination.  In moving for summary judgment, defendant treated plaintiff's Title VII and § 1981 claims as being for both a hostile environment and employment termination based on national origin.  As to the discharge claim, defendant addressed the indirect method of proof and argued plaintiff could not satisfy two of the elements of a standard *prima facie* case for a discharge case:  that plaintiff was performing his job satisfactorily and that similarly situated employees outside the protected class were treated more favorably.  *See generally **Naik v. Boehringer Ingelheim***

*Pharm., Inc.*, 627 F.3d 596, 599-600 (7th Cir. 2010); *Ervington v. LTD Commodities, LLC*, 2013 WL 1632048 *4 (N.D. Ill. April 15, 2013).

In a situation like the present one in which discipline is alleged to have been discriminatorily applied, the two elements merge: "the analysis of the employer's expectations falls by the wayside, and a 'plaintiff must establish that [s]he received dissimilar--and more harsh--punishment than that received by a similarly situated employee who was outside the protected class.'" *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (quoting *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004)).

These are also two of the elements of the standard *prima facie* case for indirect proof of a retaliatory discharge. *See Ervington*, 2013 WL 1632048 at *4 (quoting *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009)). The ordinary *prima facie* cases for indirect proof of a discriminatory discharge and retaliatory discharge are essentially the same except the former requires proof of being a member of a protect class and the comparables being outside that class and the latter requires proof of engaging in statutorily protected activity and the comparables not having engaged in such activity.

Alternatively, defendant contended it had a legitimate, nondiscriminatory reason for the discharge and plaintiff could not show that it was pretextual. *See generally Ervington*, 2013 WL 1632048 at \*4 (quoting ***Grayson v. City of Chicago***, 317 F.3d 745, 748 (7th Cir. 2003)). In his response, plaintiff ignores the arguments regarding the *prima facie* case, only addressing the pretext issue. He also indicates at the end of this discussion that he is claiming retaliation, not discrimination. *See* Pl. Br. [49] at 12.

It is generally inappropriate to skip analysis of the *prima facie* case and go directly to pretext. ***Jones v. City of Springfield, Ill.***, 554 F.3d 669, 672-73 (7th Cir. 2009). To the extent it is appropriate, it would only be when the plaintiff loses at the pretext stage, which generally means he or she would also fail to satisfy the meeting legitimate expectations element of the *prima facie* case. *See* ***Hague v. Thompson Distrib. Co.***, 436 F.3d 816, 823 (7th Cir. 2006). Here, whether claiming retaliation or discrimination against a Mexican, plaintiff does not come close to satisfying the indirect method element of others outside the protected category being treated more favorably.

Alternatively, a direct case of retaliatory discharge can be made out by showing "(1) [the plaintiff] engaged in a statutorily protected activity; (2) he

suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." **Stephens**, 569 F.3d at 786. This would require "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." **Id.** at 787 (quoting **Phelan v. Cook Cty.**, 463 F.3d 773, 779-80 (7th Cir. 2006) (quoting **Rhodes**, 359 F.3d at 504)). If plaintiff were contending he had direct evidence, pretext would not be an issue. In any event, if plaintiff is contending his circumstances constitute direct evidence of retaliation, he does not support such a contention with legal argument and, in any event, the evidence is insufficient. The June 13, 2008 letter had already threatened to discharge plaintiff if the tapes were not provided. While plaintiff filed his EEOC charge on June 6, plaintiff only cites to evidence that Howe and Weerts were aware of the EEOC charge as of June 23. *See* Pl. Br. [49] at 12 (citing Pl. Exh. 12 [50-1]). Plaintiff implies that the June 13 letter said to provide the tapes when returning to work and plaintiff never returned to work so something changed between the June 13, 2008 and October 3, 2008 letters. The only reasonable inference, however, is that the June 13 letter did not anticipate plaintiff remaining away from work for nearly four months. Also, if the change was motivated by

knowledge plaintiff had filed with the EEOC, Weerts knew this for more than three months before sending the October 3 letter.

Plaintiff's evidence does not constitute direct or indirect evidence of a retaliatory motive. Therefore, there is no basis for inferring discrimination and therefore no basis for considering pretext. *Cf.* ***Jones***, 554 F.3d at 672-73 (in failure to promote claim, since no evidence of an open position there is no reason to consider grounds and pretext for denying promotion); ***Coco v. Elmwood Care, Inc.***, 128 F.3d 1177, 1178 (7th Cir. 1997) (in age discrimination discharge case, being replaced by someone younger provides only a weak inference of discrimination so it is inappropriate to skip legitimate expectations element of *prima facie* case and go directly to pretext). Since plaintiff has not made out a *prima facie* case of discrimination, his discharge claim will be dismissed regardless of whether it is based on retaliation or Mexican discrimination. It is unnecessary to address pretext nor whether plaintiff has waived any claim.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [43] is granted. The Clerk of the Court is directed to enter judgment in

favor of defendant and against plaintiff dismissing plaintiff's cause of action with prejudice.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED:  SEPTEMBER  5, 2013